Victor Leff and Mary Leff, Husband and Wife, v. Commissioner. George Sindeband v. Commissioner.
Leff v. Commissioner
Docket Nos. 43876, 43877.
United States Tax Court
T.C. Memo 1954-226; 1954 Tax Ct. Memo LEXIS 15; 13 T.C.M. (CCH) 1138; T.C.M. (RIA) 54332; December 20, 1954, Filed *15 Seymour J. Wilner, Esq., 400 Madison Avenue, New York, N. Y., for the petitioners. Richard G. Maloney, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These cases, consolidated for hearing and consideration, involve proposed deficiencies in income taxes for the calendar year 1949 as follows: Petitioners
Deficiency
Victor and Mary Leff
$8,082.99
George Sindeband
8,392.89 Petitioners in both cases claim overpayments of income taxes for the year involved. Concessions by both parties necessitate Rule 50 decisions. The issue to be decided is what portion of the fiscal year ordinary net income of the partnership, Markay Waist House, constituted the distributive shares of petitioners Victor Leff and George Sindeband and, as such, was taxable to them as ordinary income in 1949. Findings of Fact Some of the facts have been stipulated and are hereby found. A joint income tax return of petitioners Victor and Mary Leff, [1] *16 husband and wife, and an individual income tax return of petitioner George Sindeband were filed for the calendar year 1949 with the collector of internal revenue for the third district of New York. On October 15, 1943, Victor Leff, George Sindeband, Irving J. Kaye, Elliott W. Siegel, as general partners, and Sylvia Seideman (at that time Sylvia Knebel), as a limited partner, entered into an agreement of partnership for the manufacturing, buying and selling of women's blouses under the firm name of Markay Waist House. The agreement provided for a limited partnership, commencing October 15, 1943 and continuing until October 14, 1948, under the laws of the State of New York. The general partners guaranteed that Seideman was to receive $15,000 for the first year and $10,000 per year for the next 4 years as income on her investment; the general partners were to receive annual salaries, $20,000 each to Kaye and Siegel, $15,000 to petitioner Sindeband and $12,500 to petitioner Leff, as well as 4 per cent annual interest on their invested capital; thereafter, the profits and losses were to be divided 30 per cent each to Kaye and Siegel, and 20 per cent each to petitioners. It was agreed that good will, trade name and leasehold would be deemed of no value in computing the net worth of the business at any time, and further, *17 that each general partner would devote all of his business time to the partnership and in no way become interested in a competitive business. In the event of the retirement of any general partner during the continuance of the partnership, the partnership was not thereby to be dissolved but would be continued by the surviving partners; at the end of the then current accounting period, the interest of the retired partner would terminate and the value of his interest determined, liquidated and paid over. Any additions or modifications, to be valid, were required to be in writing and signed by all the parties. The partnership adopted a fiscal year beginning February 1 and ending January 31 for tax and accounting purposes, and for all taxable periods ending as of January 31, 1948, the net income of the partnership was distributed among the general partners in accordance with the provisions of the written partnership agreement. On June 7, 1946 the general partners, for no consideration, acquired a leasehold from Millinery Center Building Corporation on premises at 521-527 Seventh Avenue, New York City. Thereafter, the enterprise had its principal place of business at that address and operated *18 as a New York partnership. Between August and October 1948, petitioners notified Kaye and Siegel of their intention to retire from the partnership on October 14, 1948, the expiration date of the partnership agreement. During September and part of October 1948, the partners carried on negotiations for the purchase by Kaye and Siegel of petitioners' and Seideman's interests in the partnership as of October 14, 1948. The parties discussed petitioners' interests in their capital accounts, accumulated profits and other partnership property, including the leasehold, the partnership name, trade-marks and trade names. In discussing the price for the outgoing partners' interests at about that time, it was agreed that Kaye and Siegel were to get possession of the trade-marks and the name of the partnership; this oral agreement was included in the formal written dissolution agreement dated January 10, 1949. The parties came to the conclusion that the partnership had no good will since it was engaged in a high-styled business. Acting upon information furnished by real estate brokers, the parties agreed that the values of Leff's and Sindeband's interests in the partnership leasehold were $20,000 *19 and $17,500, respectively, and included this oral agreement in the formal written dissolution agreement dated January 10, 1949. In determining petitioners' remaining interests in the partnership as reflected by their capital accounts, it was agreed that a physical inventory be taken of the partnership assets on October 14, 1948; that the profits of the partnership for the period February 1, 1948, to October 14, 1948, be determined therefrom; that petitioners' shares of the profits for the period be added to their capital accounts to show their capital accounts as of October 14, 1948; and that this final figure would be the price paid to them for retiring from the partnership. In accordance with this agreement, a physical inventory was taken on October 14, 1948 by Leff and his representative, Sindeband's representative and an accountant for Kaye and Siegel. Nat E. Kryske & Co., accountants for Kaye and Siegel as well as the partnership, was directed by the partners to, and did, prepare from the inventory, books and records of the partnership (1) a statement of operations for the period February 1, 1948, to October 14, 1948, and (2) a statement of assets and liabilities as of October *20 14, 1948. The statement of operations which the parties had before them in connection with the negotiations set forth a net profit of $146,546.86, after deducting from the total profit of $204,276.03 the amounts of $47,812.49 as partners' salaries, $2,833.33 as interest on partners' capital accounts, and $7,083.35 as payments to the limited partner. It also set forth each partner's distributive share of the net profit as follows: Irving J. Kaye
30%
$43,964.06
Elliott W. Siegel
30%
43,964.06
George Sindeband
20%
29,309.37
Victor Leff
20%
29,309.37 The statement of assets and liabilities included petitioners' capital accounts on October 14, 1948 as follows: Victor Leff
Capital Feb. 1, 1948
$43,692.48
Interest on Capital
$ 708.32
Salary
8,854.18
Share of Net Profit - 20%
29,309.37
38,871.87
$82,564.35
Less Withdrawals
32,401.55
$50,162.80
George Sindeband
Capital Feb. 1, 1948
$28,478.24
Interest on Capital
$ 425.00
Salary
10,625.00
Share of Net Profit - 20%
29,309.37
40,359.37
$68,837.61
Less Withdrawals
28,838.59
$39,999.02 Petitioners and their representatives examined these documents and had no objection to any of the figures contained therein. With these documents as a basis, the partners agreed as to the value of their *21 respective interests in the partnership as of October 14, 1948; it was agreed that Kaye and Siegel would purchase Leff's interest in the partnership as of October 14, 1948 for $50,000 and they would purchase Sindeband's interest as of October 14, 1948 for $40,000. Although the partnership agreement of October 15, 1943 provided for the partnership to commence on that day and continue until the 14th day of October, 1948, the partnership was not terminated on the latter date and no purchase and sale of petitioners' and Seideman's partnership interests was effected during 1948 because the partners wanted to avoid being taxed twice in 1948 on partnership income. Accordingly, the partners orally agreed to continue their partnership until the end of the fiscal year, January 31, 1949, at which time petitioners and Seideman would sell their interests in the partnership for the price and on the terms agreed upon as of October 14, 1948. The partnership books were not closed on October 14, 1948; they were closed on January 31, 1949 for the fiscal year ending on that day. Petitioners continued to have their money invested in the business, and were recorded as partners in the books and records kept *22 in the usual course of the business. However, petitioners were not to share in the profits or losses of the partnership for the period October 15, 1948 to January 31, 1949, and they were not to receive their salaries for that period, even though they were paid their salaries for the entire month of October. They did not perform any duties or functions as partners after October 14, 1948. During the period October 15, 1948 to January 31, 1949 and thereafter, Sindeband was employed by a competitor of Markay Waist House and did not return to the partnership premises after October 14, 1948. On January 4, 1949, a discussion occurred among the general partners and their representatives, and inquiry was made by an accountant named Gilbert on behalf of petitioners as to how much the partnership had shipped in the period October 15, 1948 to December 31, 1948. After the information had been furnished, Gilbert asked Kaye and Siegel for $5,000 additional for petitioners. This claim was settled when Kaye and Siegel agreed to pay $2,500 to each petitioner in addition to the purchase price previously agreed upon as of October 14, 1948. Kaye and Siegel settled the claim because they had prepared their *23 new spring line and did not want to risk any delay in introducing it on the market. Thereafter, the representatives of the parties were instructed to, and did, prepare a formal written dissolution agreement. On January 10, 1949, petitioners and Seideman entered into this written agreement with Kaye and Siegel for the dissolution of the partnership and for the sale of their interests therein to Kaye and Siegel as of January 31, 1949. It recites on the first page that "the parties * * * have heretofore carried on a business under the name of MARKAY WAIST HOUSE, pursuant to an agreement of limited partnership, dated October 15, 1943; * * *." After reciting that the parties had agreed upon the value of the interests of the retiring partners, it provided more fully for payments of $20,000 to Leff and $17,500 to Sindeband for their interests in the leasehold; $52,500 to Leff and $42,500 to Sindeband for their entire interests in the partnership as of January 31, 1949, including their capital accounts and any undistributed profits; and $100 to Leff, individually and as executor of the Estate of Minnie K. Leff, for the interest in the partnership name. To effectuate the terms of this agreement, *24 petitioners were to execute assignments of all their right, title and interest to the partnership name and to all of the trade names, brand names, trademarks, patents, patterns, styles, designs and telephone numbers. Kaye and Siegel were to carry on the partnership business as their own after January 31, 1949 and were to assume all debts and liabilities of the old partnership, with some exceptions as to New York taxes. On or about January 31, 1949, Kaye and Siegel paid $60,000 to Sindeband and $72,500 to Leff and thereby acquired, pursuant to the written dissolution agreement, the entire interests of petitioners in Markay Waist House. At approximately the same time, petitioners executed and delivered to Kaye and Siegel, in accordance with the dissolution agreement, assignments of their interests in the partnership leasehold. There was no separately stated or computed consideration for the partnership trade-marks; the dissolution agreement recited only an undivided sum as the purchase price for the entire interests (other than leasehold and name) [2] *25 of petitioners. Thereafter Kaye and Siegel continued, as copartners, the going business of Markay Waist House. On April 15, 1949, a partnership income tax return covering the fiscal year beginning February 1, 1948 and ending January 31, 1949 was filed on behalf of Markay Waist House. The ordinary net income of the partnership was reported to be $163,076.39, [3] and Schedule I reported as Partners' Shares of Income and Credits the following amounts: Charitable
Ordinary
Contri-
Partner
Net Income
butions
(a) Irving J. Kaye
$32,944.42
$2,510.46
(b) Elliott W. Siegel
32,944.42
2,510.46
(c) George Sindeband
45,833.99
1,673.64
(d) Victor Leff
44,007.71
1,673.64
(e) Sylvia Seideman
7,345.85 Although this return purported to charge petitioners with more income than Kaye and Siegel, it credited petitioners with a smaller share of the partnership's charitable contributions; the contributions were credited 30 per cent each to Kaye and Siegel and 20 per cent each to petitioners. These are the percentages of partnership profits and losses provided by the partnership agreement dated October 15, 1943. This return was prepared from the books of the partnership and on the basis of the oral agreement reached by the general partners *26 as of October 14, 1948 as to their share of the partnership profits, and also purported to include the further agreement of January 4, 1949. The sums reported as petitioners' shares of the partnership ordinary net income were computed by the partnership accountant in the following manner: [4]
George
Victor
Sindeband
Leff
Share of Net Profit per report 10/14/48 (20%)
$29,309.37
$29,309.37
Additional Profit as agreed 1/4/49
2,500.00
2,500.00
Amount paid 10/28/48 in excess of credit for salary and interest
after 10/14/48 *
500.00
312.50
$32,309.37
$32,121.87
Plus or minus difference between the balance in the capital ac-
count per report of 10/14/48 and the amount agreed upon for
payment of capital and profit as of 10/14/48
.98
(162.80)
Net Income per books 1/31/49
$32,310.35
$31,959.07
Net Income (as above)
$32,310.35
$31,959.07
Plus salary and interest paid
11,850.00
10,375.00
Plus charitable contributions - not deductible
1,673.64
1,673.64
Net Income per Partnership Return for fiscal year ending 1/31/49
$45,833.99
$44,007.71
* * * * * * * * * * * * During the same fiscal year, there were credited on the books of the partnership, (1) as salaries, $15,000 to Kaye's capital account, $15,000 to Siegel's capital account, $11,250 *27 to Sindeband's capital account, and $9,375 to Leff's capital account; and (2) as interest on invested capital, $1,200 to Kaye's capital account, $1,200 to Siegel's capital account, $600 to Sindeband's capital account, and $1,000 to Leff's capital account. In this same fiscal year, Sindeband withdrew $18,288.59 from his capital account, and Leff withdrew $23,151.55 from his capital account, such sums being in addition to the aforementioned salaries and interest. On April 25, 1949, Kryske & Co. notified Leff that his distributive share of the partnership's net income for the fiscal year ended January 31, 1949, as reported on the partnership return, totaled $44,007.71, *28 and that his share of the partnership's contributions amounted to $1,673.64. By letter to Kryske & Co. dated May 16, 1949, Leff objected to the amount of the partnership net income allocated to him on the partnership return and stated that his distributive share of the partnership net income for the fiscal year ended January 31, 1949 amounted to $30,596.11, including salary and partnership contributions. This was in reply to a letter dated May 11, 1949 from Kryske & Co. to Leff, in which it was stated: "As you will undoubtedly recall, prior to execution of the dissolution agreement dated January 10, 1949, conferences were held with a view toward arriving at a figure which would represent your capital in the partnership and your share of the partnership income. As a result of these conferences, it was estimated that your capital investment plus your share of the partnership income amounted to $52,500.00, which sum was paid to you between January 13th and January 31, 1949. "It has since been ascertained that the said payment was based upon an erroneous estimate of the actual income of the partnership for the period. Since, however, the payment in fact represented your agreed share of *29 the income it must necessarily be treated as such in the return filed on behalf of the partnership. No other treatment would accurately reflect the transaction in the light of the actual facts." On their joint income tax return for the calendar year 1949, Victor and Mary Leff reported $28,922.47 as Leff's distributive share of partnership net income and deducted $1,702 as his share of the partnership's contributions. On his individual income tax return for the calendar year 1949, Sindeband reported $32,071.11 as his distributive share of partnership net income and deducted $1,673.64 as his share of the partnership contributions. On April 11, 1952, an amended partnership income tax return covering the fiscal year beginning February 1, 1948, and ending January 31, 1949, was filed on behalf of Markay Waist House and signed by Sindeband as partner. Attached to this amended return was the following explanation of Schedule I: "SCHEDULE I - PARTNERS SHARES OF INCOME AND CREDITS FOR THE FISCAL YEAR ENDED JANUARY 31, 1949 "By agreement dated January 10, 1949, Irving J. Kaye and Elliott W. Siegel purchased the interests in this partnership of Victor Leff, Sylvia Seideman and George Sindeband. *30 If the partners shares so sold were capital assets in their entirety, as Sindeband contends, then the following is the correct schedule of partners' shares: 1.
2.
3.
"Name and Address
Percentage of Time
Ordinary
of Each Partner
Devoted to Business
Net Income
Irving J. Kaye, 751 Walton Ave., Bronx
Full
$65,079.13
Elliott W. Siegel, 650 West End Ave., N.Y.C.
Full
65,079.13
George Sindeband, 25 Central Park West, N.Y.C.
Full
13,523.64
Victor Leff, 201 West 89th St., N.Y.C.
Full
12,048.64
Sylvia Seideman, 250 West 94th St., N.Y.C.
None
7,345.85
$163,076.39
"On the other hand, if the only portion of partners' shares constituting capital assets was in each case the sale price less the percentage of income earned for the fiscal year which the partnership agreement allocated to each partner, then the following is the correct schedule of partners' shares: 1.
2.
3.
"Irving J. Kaye
Full
$46,531.66
Elliott W. Siegel
Full
46,531.66
George Sindeband
Full
32,071.11
Victor Leff
Full
30,596.11
Sylvia Seideman
None
7,345.85
$163,076.39" Respondent determined the deficiencies herein upon the distribution of partners' shares of income and credits contained in Schedule I of the partnership return prepared and filed by Kryske & Co. and signed by *31 Siegel. The agreement reached with reference to the partnership interests as of October 14, 1948 resulted in a change in the respective interests of petitioners in the partnership profits for the entire partnership fiscal year ending January 31, 1949. Opinion This proceeding presents essentially a factual issue as to what occurred in connection with the dissolution of the partnership of which petitioners were members. It does not seem to be seriously disputed that a withdrawing partner is taxable upon the share of current partnership profits to which he is entitled and on which tax has not yet been paid. Le Sage v. Commissioner, (C.A. 5) 173 Fed. (2d) 826; but cf. Meyer v. United States, (C.A. 7) 213 Fed. (2d) 278. See Helvering v. Smith, (C.A. 2) 90 Fed. (2d) 590; see also Miller "Capital Gains Taxation of the Fruits of Personal Effort: Before and Under the 1954 Code," 64 Yale L.J. 1, 37. Nor do we think it can be doubted that partners can arrange and change from time to time the proportionate part of the partnership income to which each will be entitled, and that the tax consequences then follow the agreement. Hellman v. United States, (Ct. Cl., 1930) 44 Fed. (2d) 83. When *32 the partnership in question was about to terminate under the terms of the written agreement by which it was created and the partners determined by mutual consent that petitioners would be paid off and withdraw at the end of the then fiscal year of the partnership, some discussions were obviously necessary as to what price would be paid by the remaining partners. Petitioners contend that the written agreement was to be continued in all respects after its formal termination date. The remaining partners, who were not parties to the proceedings but who appeared as witnesses, took the opposite position, that a change in the respective interest of the partners in the profits was agreed upon. This direct conflict in testimony must be resolved one way or another. Our ultimate finding disposes of the question. No useful purpose would be served by detailing our reasons for having arrived at that conclusion of fact. We do so upon a careful examination of the entire record. [5] It may be said in passing, however, that the uncontradicted facts are too clear that the original partnership agreement did not continue in a number of respects for us to be able to make that finding. Once we are forced *33 to depart from the written document, as we are, we have made the best analysis of the testimony and other evidence that seems to us possible in order to arrive at the ultimate conclusion of fact. Certain adjustments must, we think, nevertheless, be made to the deficiency as determined by respondent. We set forth in the margin [6]the details by which petitioners' income is now said to be computed. The items of $2,500 added to the originally settled purchase price and $1,104.60 representing adjustments made by respondent to *34 the partnership income in the case of Sindeband and $1,071.12 in the case of Leff were not and probably could not have been agreed to by the parties as a share which petitioners were to obtain in the partnership profits. The $1,100 items were presumably not considered by the parties at all since they do not result from the figures on the basis of which the negotiations were carried on. And although we are satisfied that the $2,500 adjustment in the purchase price was a last minute change in the figures there is nothing to show that the parties agreed that this was a method of dividing partnership profits. The amount was a compromise figure adopted for purposes of concluding the transaction and was presumably an additional amount paid for the entire package including capital account, income and other assets. With these corrections, however, we conclude that the deficiency should be sustained. Decisions *35 will be entered under Rule 50. Footnotes
1. Subsequent reference to petitioners does not include Mary Leff, who is a party only because of the joint return.
2. As to the partnership name, the dissolution agreement recited a consideration flowing to Leff, but no mention was made of Sindeband.
3. Petitioners concede the correctness of respondent's adjustment of partnership ordinary net income to $167,726.39.↩
4. This computation was not used by respondent in determining the deficiency. ↩
*. ↩
Amount paid subsequent to Oct. 14, 1948
$ 1,300.00
$ 1,125.00
Less credits after Oct. 14, 1948
Salary 1/2 month 10/15 to 10/31
625.00
520.82
Interest 1/2 month 10/15 to 10/31
25.00
41.68
Interest - November
50.00
83.33
Interest - December
50.00
83.33
Interest - January
50.00
83.34
Total credits
$ 800.00
$ 812.50
Net amount paid in excess of credits
$ 500.00
$ 312.50
5. Much is made by petitioners of the fact that the partnership return as filed on behalf of the continuing partners allocated charitable contributions in accordance with the shares of partnership income under the original partnership agreement. If this is error by reason of the fact that the contributions were not entirely completed prior to October 14, it is a harmless one as far as petitioners are concerned. Had they been charged with a greater percentage of charitable contributions their share of the partnership income would thereby have been increased rather than decreased; but on the other hand their permissible charitable deductions would likewise have risen. ↩
6. ↩
George
Victor
Sindeband
Leff
(1) 20% of the net profits from 2/1/48 to 10/14/48
$29,309.37
$29,309.37
(2) Estimated profits agreed 1/4/49
2,500.00
2,500.00
(3) Salary
11,250.00
9,375.00
(4) Interest on capital
600.00
1,000.00
(5) Charitable contributions
1,673.64
1,673.64
(6) Uncontested share of partnership's adjustments per deficiency
notices
1,104.60
1,071.12
Total
$46,437.61
$44,929.13